IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LADENE M. TALBOTT,                §
                                  §
        Plaintiff,                §
                                  §
v.                                §        CIVIL NO. H-05-4313
                                  §
JO ANNE B. BARNHART,              §
COMMISSIONER OF THE               §
SOCIAL SECURITY ADMINISTRATION,   §
                                  §
        Defendant.                §

## MEMORANDUM OPINION

Pending before the court[1] are Defendant's Motion for Summary Judgment (Docket Entry No. 15) and Plaintiff's Motion for Summary Judgment (Docket Entry No. 16).  The court has considered the motions, all relevant filings, and the applicable law.  For the reasons set forth below, the court **GRANTS** Defendant's motion and **DENIES** Plaintiff's motion.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner") regarding Plaintiff's claim for disability benefits under Title II and Title XVI of the Social Security Act ("the Act").

## A.  Factual History

_____

[1]     The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Docket Entry Nos. 12-14.

Plaintiff was born on June 16, 1975, and was twenty-six years old on the date of the alleged onset of disability.[2]  Plaintiff completed ninth grade and obtained a General Equivalency Diploma (GED).[3]  Prior to the alleged onset of her disability, Plaintiff worked as a cashier, an office clerk, a driver, a telephone sales clerk, and a stocker.[4]  After the alleged onset of disability, Plaintiff returned to work briefly in July and August 2002, but was unable to continue working because of her illness.[5]

Plaintiff's medical records reflect that she was diagnosed with a large chiasmatic hypothalamic region glioma (in simpler terms, a brain tumor).[6]  The tumor was first discovered in 1998 during treatment after an automobile accident.[7]  Plaintiff developed symptoms of headaches, forgetfulness, and short-term memory loss.[8]  Her treatment provider performed a biopsy of the tumor and, as a part of the biopsy procedure, surgically placed a ventriculoperitoneal shunt to drain excess cerebrospinal fluid from her brain.[9]  A month later, the shunt was replaced after an

---

[2]   Transcript of the Administrative Proceedings ("Tr.") 72, 112.

[3]   Tr. 93, 310, 354.

[4]   See Tr. 88, 96-102, 117-123, 301, 352, 354, 380.

[5]   Tr. 111, 193, 303.

[6]   Tr. 181.

[7]   Id.

[8]   Id.

[9]   Id.

infection.[10]  Physicians at M.D. Anderson continued to monitor the tumor with regularly scheduled magnetic resonance imaging scans ("MRIs").[11]

In December 2001, Plaintiff reported decreased vision, particularly in her left eye.[12]  MRIs in late March and early April 2002 "showed increased regions of enhancement within the tumor," although the size of the tumor remained static.[13]  Franco DeMonte, M.D., ("Dr. DeMonte") performed brain surgery on May 7, 2002, partially removing the tumor.[14]  Following surgery, Plaintiff's vision improved, and, by the time of her discharge, she was ambulating independently and tolerating solid food.[15]

An MRI performed in August 2002 revealed a slight increase in the area of enhancement, which indicated a recurrence of the progression of the tumor.[16]  Plaintiff was scheduled for a second tumor resection surgery.[17]  Immediately prior to surgery, Plaintiff denied experiencing seizures, changes in her level of

---

[10]     Tr. 193.

[11]     Id.

[12]     Tr. 141, 181.

[13]     Tr. 176, 186.

[14]     Tr. 181.

[15]     Tr. 181-82.

[16]     Tr. 177, 180.

[17]     See 177.

consciousness, memory difficulties, or instability while walking.[18]
On September 5, 2002, Dr. DeMonte successfully removed more of the
tumor without encountering any complication.[19]  Upon discharge, he
instructed Plaintiff not to drive or work pending his release after
followup.[20]  Plaintiff reported that her vision was unchanged.[21]

The SSA ordered a psychological consultative examination that
was completed in November 2002.[22]  At the examination, Plaintiff
reported problems with sleep, excessive worry, tension, and
anxiety.[23]  Plaintiff expressed a strong desire to return to work
and indicated that she was waiting for medical clearance.[24]
Plaintiff achieved a full scale intelligence quotient (IQ) of 77.[25]
The examiner determined that:  Plaintiff's verbal and nonverbal
functioning were in the borderline range; her retention of general
information and visual motor speed were moderately deficient; her
immediate auditory memory, numerical reasoning, alertness to visual
detail, academic functioning, and visual-motor integration were
mildly deficient; her expressive vocabulary, comprehension of

---

[18]    Id.

[19]    Tr. 170.

[20]    Id.

[21]    Id.

[22]    See Tr. 192.

[23]    Tr. 194.

[24]    Id.

[25]    Tr. 195.

social behavior, abstract verbal reasoning, visual sequential reasoning, and abstract visual reasoning were low average; and her visual motor assembly skills were average.[26]   Based on the examination and tests, the examiner diagnosed Plaintiff with major depressive disorder, cognitive disorder, and borderline intellectual functioning.[27]

In December 2002, Charles Conrad, M.D., ("Dr. Conrad") saw Plaintiff in the neuro-oncology clinic.[28]   He noted that Plaintiff tolerated the two surgeries well and was functioning well.[29]   Other than "some mild short-term memory difficulties," Plaintiff did not report any problems.[30]   Upon review of the most current MRI, Dr. Conrad recognized the possibility of "some minimal residual tumor in the most posterior aspect of the regional tumor bed of the third ventricular region," but could not differentiate scarring from residual tumor.[31]   The swelling from surgery was completely resolved.[32]   Dr. Conrad referred Plaintiff to a physician in neuropsychology for training in short-term memory compensation

---

[26]     Tr. 195-96.

[27]     Tr. 197.

[28]     Tr. 147.

[29]     Id.

[30]     Id.

[31]     Id.

[32]     Id., 148.

techniques and remarked, "[W]e would hope that she would make gains what would allow her to again find employment."[33]

In March 2003, Dr. Conrad completed a physician's statement in which he opined that Plaintiff could not work due to both mental and physical disabilities.[34]   In his opinion, Plaintiff was permanently disabled.[35]  Dr. Conrad's prognosis was "guarded."[36]

Dr. Conrad saw Plaintiff again in July 2003 and noted that she remained "clinically and radiographically" stable.[37] He also noted that Plaintiff was able to manage her short-term memory problems.[38] Dr. Conrad released Plaintiff to return to work.[39]  An appointment in September 2003 with Steven I. Sherman, M.D., also revealed no issues of concern.[40]

The MRI scans performed on January 12, 2004, disclosed no progression of the residual tumor and revealed proper placement of the shunt with no evidence of hydrocephalus or midline shift.[41]  At that time, Plaintiff reported experiencing mild-to-moderate,

---

[33]    Tr. 147.

[34]    Tr. 227.

[35]    Id.

[36]    Id.

[37]    Tr. 253.

[38]    Id.

[39]    Id.

[40]    Tr. 252.

[41]    Tr. 247-48.

diffuse headaches on a daily basis, but indicated that they responded well to over-the-counter medication.[42] She also reported that she felt depressed with occasional suicidal ideation.[43] Dr. Conrad referred Plaintiff to a psychiatrist for treatment of depression.[44]

When Plaintiff was seen by a psychologist in January 2004, Plaintiff explained that she was depressed and lethargic.[45] She connected her depression to the fact that she had "'lost everything,'" including her boyfriend, her job, and her house in the last eighteen months" and that she lacked the energy to change her circumstances.[46] With regard to her mental status, Plaintiff stated that, although she continued to experience memory problems, she was able to keep track of her daily activities with the use of calendars.[47] She denied any problem with clarity of thought, language, or concentration (as long as she was in a quiet environment).[48] She indicated that she wanted to return to work, but was concerned that no one would hire her.[49]

---

[42]     Tr. 247.

[43]     Id.

[44]     Tr. 248

[45]     Tr. 249.

[46]     Id.

[47]     Id.

[48]     Id.

[49]     Id.

The psychologist, Christina A. Meyers, PhD., ("Dr. Meyers"), administered a series of tests on Plaintiff's intellectual, memory, language, visual motor, and motor skills.[50]  In comparison to test scores dating back to February 2002, Plaintiff showed improvement in visual spatial construction and verbal abstract reasoning.[51]  All other scores remained stable.[52]  Dr. Meyers referred Plaintiff for assistance with vocational issues and compensatory strategies and scheduled Plaintiff for a followup in one year.[53]

Plaintiff's medications in May 2004 were Dostinex, Wellbutrine, Trazadone, and Celexa.[54]  The first was hormone therapy,[55] and the other three treated depression.[56]  At an appointment with Dr. Conrad on May 28, 2004, Plaintiff reported that the treatment for associated depression and anxiety was going very well and that she was not experiencing seizures, headaches, nausea, vomiting, focal motor or sensory changes, or alterations in mental status.[57]  Plaintiff's chief complaint on that occasion was

---

[50]     Id.

[51]     Id.

[52]     Id.

[53]     Tr. 250.

[54]     Tr. 240.

[55]     The tumor's location caused Plaintiff hormonal difficulties.  See Tr. 375.

[56]     Id.

[57]     Tr. 244.

tenderness associated with her shunt.[58]  Dr. Conrad moved up her next-scheduled MRI.[59]

Plaintiff saw Dr. Conrad again in early June.[60]  At that time, Plaintiff's mood was stable, and she was experiencing no new neurological symptoms and no new visual abnormalities.[61]  However, MRI scans "revealed a subtle but definite increase in the enhancing abnormalities in the region of the residual tumor," which suggested further progression of the tumor.[62]  After the June appointment with Dr. Conrad, Plaintiff continued in treatment, which included a round of radiation therapy.[63]

### B.  **Procedural History**

Plaintiff filed for disability benefits on September 25, 2002, claiming an inability to work since May 7, 2002, due to a brain tumor.[64]  In connection with the brain tumor, Plaintiff alleged visual limitations, anxiety, and depression.[65]

On an SSA form completed in October 2002, Plaintiff reported that her daily activities included preparing breakfast, preparing

---

[58]    Tr. 244, 245.

[59]    Tr. 245.

[60]    Tr. 281.

[61]    Id.

[62]    Tr. 282.

[63]    See Tr. 256.

[64]    Tr. 72, 74, 87, 112.

[65]    See Tr. 53, 58.

her son for school, cleaning house, going to doctor appointments, walking, shopping, picking up her son, making dinner, and preparing her son for bed.[66]  She was having difficulty remembering things and taking her son to school or picking him up on time.[67]  Plaintiff was able to sit, stand, walk, lift, carry, use her hands, bend, kneel, squat, climb, and reach.[68]  She stated that she was capable of driving, reading, watching television, using a telephone, gardening, and grooming herself without limitation.[69]

According to a Medical Vocational Decision Guide completed in November 2002, the Commissioner found that Plaintiff was not able to perform her past relevant work, but could work as a mixer in the textile industry, a billposter in business services, or a cleaner/housekeeper in any industry.[70]  In a residual functional capacity ("RFC") assessment from that time period, a medical consultant determined that Plaintiff had no exertional, postural, manipulative, visual, communicative, or environmental limitations.[71] He found that Plaintiff's alleged limitations were supported by the

---

[66]    Tr. 126, 129.

[67]    Tr. 127.

[68]    Tr. 130.

[69]    Id.

[70]    Tr. 131.

[71]    Tr. 201-05.

medical record, but were not expected to last twelve or more months.[72]

A medical consultant completed a Psychiatric Review Technique on December 16, 2002.[73] He reviewed three medical listings in the regulations (the "Listings")[74] to determine whether Plaintiff qualified as disabled on any of those bases.[75] Although finding medically determinable impairments that fit within Listings 12.02 (organic mental disorders), 12.04 (affective disorders), 12.05 (mental retardation), the consultant did not find that Plaintiff's limitations precisely met the diagnostic criteria for any of the three listings considered.[76] The consultant found that Plaintiff was not markedly limited in her ability to perform any mental tasks and noted, "The claimant retains the mental ability to understand and follow simple instructions, to adequately interact with coworkers and supervisors, and to adapt to routine work environments."[77]

In a decision issued in December 2002, the Commissioner denied Plaintiff's application at the initial level of review because,

---

[72]    Tr. 206.

[73]    See Tr. 209-22.

[74]    20 C.F.R. Pt. 404, Subpt. P, App. 1.

[75]    See Tr. 209-22.

[76]    Tr. 209, 210, 212, 213.

[77]    Tr. 223-25.

based on the anticipated post-surgery improvement, Plaintiff's disability was not expected to last for twelve or more months.[78] Plaintiff requested reconsideration of the decision and completed an additional disability report.[79] On that form, Plaintiff reported that her vision and memory were getting worse.[80] She also said that she was extremely exhausted.[81] As to how her illness affected her ability to care for herself, she wrote, "[I] continue to forget either to brush teeth, hair, tie shoes, put in contacts. Sometimes I even forget where I am going or even why. Or even simple thing like to buckle my seatbelt or turn light on at night in a car."[82]

A second Medical Vocational Decision Guide, completed by a different reviewer, lists laundry worker, cafeteria attendant, and collator operator as jobs that Plaintiff could perform.[83] Thus, the Commissioner again determined that Plaintiff was not disabled, finding that her condition was severe enough to prevent her from being capable of her past relevant work, but not so severe as to keep her from working entirely.[84]

---

[78]    Tr. 46B, 47-53.

[79]    Tr. 54, 132.

[80]    Tr. 132.

[81]    Id.

[82]    Tr. 134.

[83]    Tr. 137.

[84]    Tr. 46C, 55-58.

12

In June a medical consultant reviewed the record and completed an RFC Assessment.[85]   The consultant found that Plaintiff had not established any exertional, manipulative, or communicative limitation.[86]   According to the consultant, Plaintiff frequently could climb ramps or stairs, could balance, could stoop, could kneel, could crouch, and could crawl, but never could climb ladders, ropes, or scaffolds.[87]   He also determined that she had visual limitations and should limit exposure to dangerous environments due to her visual problems.[88]

After the denial on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").[89]   The ALJ granted Plaintiff's request and conducted a hearing on July 14, 2004.[90]   At the hearing, Plaintiff, Plaintiff's father, and a vocational expert testified.[91]

Plaintiff testified that she had looked for work without success.[92]  She described her medical history and explained that she was receiving radiation therapy because the tumor began to grow

---

[85]     See Tr. 232-39.

[86]     Tr. 233, 235, 236.

[87]     Tr. 234.

[88]     Tr. 235-36.

[89]     Tr. 59.

[90]     Tr. 60-65, 297-385.

[91]     See 297-346.

[92]     Tr. 304-05.

again.[93]   Plaintiff complained of problems with her memory and her vision.[94]   Although Plaintiff was unable to drive, she was able, with breaks, to perform household chores, such as preparing meals, washing the dishes, sweeping and mopping the floor, and washing clothes.[95]   For exercise, she stated, she took walks and "r[o]de every once in a while with my son, around."[96]   She reported no physical limitations.[97]

Plaintiff's father testified that her memory loss did not seem to be severe, but that she could not remember things without the use of calendars and reminders.[98]   He dated the memory problems back to the time after Plaintiff's second tumor resection.[99]   The greatest impediment to Plaintiff's return to work, in her father's opinion, was her memory loss.[100]

The vocational expert, Thomas King ("Mr. King") classified Plaintiff's past work of "data entry clerk or order clerk" and convenience store clerk as sedentary and semi-skilled, her past work of "counter clerk" as medium and semi-skilled, and her past

---

[93]   Tr. 306-07.

[94]   Tr. 305, 307, 313.

[95]   Tr. 312, 315.

[96]   Tr. 315.

[97]   Tr. 316.

[98]   Tr. 322.

[99]   Id.

[100]   Tr. 325.

work of "a pharmacy clerk" as light and semi-skilled.[101]
Plaintiff's record-keeping, clerical, and public relations skills
were transferrable to other types of jobs, according to the
vocational expert.[102]  The ALJ asked Mr. King whether a hypothetical
person of claimant's age, educational background, job experience
could perform work at the light exertional level with the following
limitations:  no crawling, no balancing, no climbing of ladders or
scaffolding, no working around hazards (heights, vibrations,
dangerous machinery).[103]  Mr. King responded that Plaintiff could
perform her past work of pharmacy clerk and data entry or order
clerk, as well as other jobs largely available in the regional
economy[104]  Even if Plaintiff were restricted to sedentary work, Mr.
King opined, she could perform her past work of data entry or order
clerk, as well as additional jobs that are available regionally.[105]

Plaintiff's attorney then asked how "severe depression and
anxiety and severe forgetfulness, confusion, word finding problems,
irritability, and low frustration of tolerance" would affect
Plaintiff's job prospects.[106]  Mr. King stated that, if severe

---

[101]    Tr. 339.

[102]    Id.

[103]    Id.

[104]    Tr. 340.

[105]    Tr. 341.

[106]    Tr. 342.

15

enough, those limitations would preclude semi-skilled work, but might allow unskilled work.[107]  Based on the attorney's question, the ALJ posed a new hypothetical requiring a low-stress environment and simple, routine work.[108]  Mr. King stated that the hypothetical person could perform light unskilled work.[109]

The ALJ stated that he would not make a decision until September 1, 2004, so that Plaintiff's attorney could submit a progress report concerning the effectiveness of the radiation treatment.[110]

The ALJ held a supplemental hearing on January 24, 2005, at which Plaintiff, Mr. King, and Grethe Wik, D.O., ("Dr. Wik") testified.[111]  In response to questioning by her attorney, Plaintiff reviewed her vocational and medical histories.[112]  Predominantly, she complained of vision loss and memory loss, but also mentioned frequent headaches.[113]  By the time of the second hearing, she had completed eight continuous weeks of radiation.[114]  Plaintiff also reported that she regularly saw a psychiatrist at M.D. Anderson for

---

[107]   Id.

[108]   Tr. 343.

[109]   Id.

[110]   Tr. 345.

[111]   See Tr. 347-85.

[112]   See Tr. 352-65.

[113]   See Tr. 353, 354-55, 359, 362-63.

[114]   Tr. 357.

ongoing therapy.[115]   Her testimony regarding activities of daily living was consistent with what she stated at the earlier hearing.[116]

Dr. Wik testified that, despite wording in the medical record suggesting that a recurrence of the tumor prompted the second surgery, Plaintiff's resection actually was planned to be performed in two stages.[117]   She explained that the tumor interfered with proper functioning of Plaintiff's pituitary gland and hypothalamus, resulting in prolactinemia[118] and depression.[119]   Dr. Wik expressed significant concern about the location and growth of the tumor.[120] Dr. Wik concluded that Plaintiff's condition met the requirements of Listing 13.13 (Malignant Neoplastic Diseases–Nervous System).[121]

After Dr. Wik testified, Mr. King classified Plaintiff's prior work as a "counter parts clerk," a "convenient store clerk," and a "pharmacy clerk" as light exertional and semi-skilled work and as a "billing and phone clerk" as sedentary exertional and semi-

---

[115]   Tr. 360-61.

[116]   Compare Tr. 367-69 with Tr. 312, 315.

[117]   Tr. 372.

[118]   A condition related to the improper functioning of the pituitary gland.   Cf. Mosby's Pocket Dictionary of Medicine, Nursing, & Allied Health (Mosby's) 727–28 (1st ed. 1990).

[119]   Tr. 375.

[120]   See Tr. 375-77.

[121]   Tr. 377-78.

skilled work.[122]  Plaintiff possessed several transferable skills, per Mr. King.[123]  The ALJ asked if a person of Plaintiff's age, educational background, and vocational background, could perform work at a light level of exertion with limitations of no crawling, balancing, climbing of ladders or scaffolds and no working around heights, vibrations, and dangerous machinery.[124]  Mr. King responded that the hypothetical person could perform many jobs and listed a couple that were available in large numbers in the regional economy.[125]  Upon the addition of further restrictions, which included sedentary exertion and a sit/stand option, Mr. King responded that Plaintiff could perform her past work as a billing clerk and listed several other job titles.[126]

Plaintiff's attorney added a need to lie down for two hours at least twice a week, to which Mr. King responded that the restriction would be difficult for an employer to accommodate.[127] As a final question, Plaintiff's attorney asked how cognitive impairments, including severe confusion, and forgetfulness,

---

[122]    Tr. 380.

[123]    Id.

[124]    Tr. 381.

[125]    Id.

[126]    Tr. 381-82.

[127]    Tr. 382-83.

irritability, would impact job options.[128]   Mr. King agreed that such impairments would "impact severely on keeping a job."[129]

On March 18, 2005, the ALJ issued his decision finding that Plaintiff met the requirements for insured status on the alleged onset date of disability through June 30, 2004.[130]   He found that she had not engaged in substantial gainful activity during the relevant time period and that she had a combination of impairments ("a pilocytic astrocytoma of the suprasellar region, status post radiation treatment, and status post craniotomy") that was severe.[131]   Despite Dr. Wik's testimony to the contrary, the ALJ determined that Plaintiff's impairments, singly or in combination, did not meet or equal any of the Listings.[132]   The ALJ did not fully credit either Dr. Wik's testimony or Plaintiff's testimony.[133] Plaintiff retained an RFC, according to the ALJ, to perform light work with some restrictions, which made her capable of "her past relevant work as a counter parts clerk, billing and telephone clerk, convenience store clerk, and pharmacy clerk."[134]

---

[128]    Tr. 383.

[129]    Id.

[130]    Tr. 40, 41.

[131]    Tr. 40.

[132]    Tr. 37, 40.

[133]    Tr. 37, 38.

[134]    Tr. 41.

Plaintiff appealed the ALJ's decision, and the Appeals Council granted her request for review.[135]  Pasquale Santini, M.D., ("Dr. Santini"), medical support staff, reviewed Plaintiff's medical record at the behest of the Appeals Council.[136]  Dr. Santini opined:

> After thoroughly reviewing the medical data provided[,] . . . I would state that . . . the claimant does meet the listings under 13.13A2.  This listing is in reference to central nervous system neoplasm which is progressive or recurrent following initialing neoplastic therapy.  I would consider that the partial resections of May and September 2002 were her initial treatments and in June 2004 she was noted to have progression on imaging studies.  She underwent external radiation therapy and again was noted to have mild increase enhancement on MRI of this region in November 2004.  Based on this line of thinking I believe that the claimant does meet the listings when she was noted to have progression of the lesion on June 7, 2004.  Subsequent follow ups are going to be [necessary] in terms of analyzing progression and or stability of this neoplasm.[137]

Dr. Santini also concluded that, prior to meeting Listing 13.13 on June 7, 2004, Plaintiff's residual functional capacity included no exertional limitations, but required that she not climb ladders, ropes, or scaffolds and not work around heights or hazardous machinery.[138]

In reliance on Dr. Santini's opinion, the Appeals Council found that Plaintiff became disabled on June 7, 2004.[139]  The

---

[135]    Tr. 27, 290.

[136]    See Tr. 290, 294-95.

[137]    Tr. 294.

[138]    Tr. 295.

[139]    Tr. 291.

Appeals Council notified Plaintiff of its intention to issue a partially favorable decision and allowed Plaintiff thirty days to submit additional evidence or legal argument regarding her disability status prior to June 7, 2004.[140]   Having received no comments or additional evidence, the Appeals Council issued its opinion on December 1, 2005.[141]

In its opinion, the Appeals Council adopted the ALJ's statements of law, issues, and evidentiary facts, but rejected the ALJ's conclusions regarding Plaintiff's disability status for the period beginning June 7, 2004.[142]  With regard to the period prior to that, the Appeals Council adopted the ALJ's conclusion that Plaintiff could perform light work with limitations and was capable of returning to her past relevant work.[143]   Plaintiff filed an appeal of the Appeals Council's decision with this court on December 20, 2005.

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) substantial evidence in the record supports the decision; and 2) the ALJ applied proper legal standards in

---

[140]   Id.

[141]   Tr. 12-15.

[142]   Tr. 12.

[143]   Tr. 13, 14.

evaluating the evidence.  <u>Waters v. Barnhart</u>, 276 F.3d 716, 718 (5th Cir. 2002); <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999).

**A.   <u>Substantial Evidence</u>**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion," <u>Carey v. Apfel</u>, 230 F.3d 131, 135 (5th Cir. 2000).   It is "something more than a scintilla but less than a preponderance." <u>Id.</u>  The Commissioner has the responsibility of deciding any conflict in the evidence. <u>Id.</u>  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.   42 U.S.C. § 405(g); <u>Selders v. Sullivan</u>, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.   <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).   In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. <u>Brown</u>, 192 F.3d at 496.   In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.   <u>Id.</u>

**B.   <u>Legal Standard</u>**

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. §§ 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to an impairment listed in [the Listings] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. §§ 404.1520. By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth. Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999); Brown, 192 F.3d at 498. The Commissioner can satisfy her burden either by reliance upon the Medical-Vocational Guidelines of the Regulations or by expert vocational testimony or other similar evidence. Fraga v. Bowen, 810 F.2d 1296, 1304 (5th Cir. 1987). If the Commissioner satisfies her step-five burden of proof, the burden shifts back to the claimant to prove she cannot perform the work suggested. Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

### III.  Analysis

Plaintiff requests judicial review of the Appeal Council's decision to deny disability benefits. Plaintiff contends that the decision is not supported by substantial evidence and that the Appeals Council did not follow proper legal procedures. Specifically, Plaintiff argues that the Appeals Council failed to follow established procedures in setting the onset date of Plaintiff's disability. Defendant, on the other hand, argues that the Appeals Council's decision is legally and factually correct. Having reviewed the entire record, the court finds that the Appeals

Council committed no legal error and based its decision on substantial evidence.

Plaintiff bases her argument on a 1983 Social Security Ruling ("SSR")[144] that explains the procedures for correctly setting the onset date of disability. See SSR 83-20. As the policy statement, the SSR reads:

> The onset date of disability is the first day an individual is disabled as defined in the Act and the regulations. Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence. These factors are often evaluated together to arrive at the onset date. However, the individual's allegation or the date of work stoppage is significant in determining onset only if it is consistent with the severity of the condition(s) shown by the medical evidence.

SSR 83-20, at *1. In cases of nontraumatic disabilities, SSR 83-20 identifies medical evidence as "the primary element in onset determination." Id. at *2. The ruling acknowledges that the onset date may be difficult to pinpoint because of the slow progression of some diseases and cautions that, in such cases, the impairment need not reach listing severity before onset can be established. Id. The individual's allegation of onset date cannot be relied upon when it is inconsistent with the record medical evidence. Id. at *3.

---

[144]    Although SSRs are not binding on the court, they may provide the court with guidance on the proper legal standards. Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001).

In 1990, the Fifth Circuit applied SSR 83-20 to a case in which six years of medical records were unavailable.  Ivy v. Sullivan, 898 F.2d 1045 (5th Cir. 1990).  The ALJ denied the claim because the claimant failed to offer precise medical data concerning her claims of obesity and high blood pressure for that period of time.  Id. at 1048.  Citing SSR 83-20, the Fifth Circuit wrote:

> The production of precise medical records is not a requisite to the establishment of a disability onset date.  Rather, the agency expects the all-too-common situation where adequate medical records are no longer available, and opined that in such cases it is necessary to infer the onset date from "the medical and other evidence that describe the history and symptomatology of the disease process."

Id. at 1049.  The opinion also stated that the claimant's allegation regarding the onset date should be used when consistent with available evidence and "may be rejected only if reasons are articulated and the reasons given are supported by substantial evidence."  Id. at 1048.

In 1993, the Fifth Circuit discussed SSR 83-20, this time in the context of a slowly progressing mental impairment.  Spellman v. Shalala, 1 F.3d 357 (5th Cir. 1993).  In that case, "the Appeals Council arbitrarily selected an onset date six months prior to the first mental evaluation suggest[ing] that the medical record was ambiguous with regard to the onset date."  Id. at 363.  The Fifth Circuit held that "in cases involving slowly progressive impairments, when the medical evidence regarding the onset date of

26

a disability is ambiguous and the [Commissioner] must infer the onset date, SSR 83-20 requires that that inference be based on an informed judgment," which cannot be made without the assistance of a medical advisor. Id. at 362, 363.

Here, Plaintiff argues that her alleged onset date of disability is May 7, 2002, that she was admitted to the hospital for brain surgery on May 7, 2002, and that her last day of work was May 7, 2002. Therefore, she concludes, her onset date should be May 7, 2002. She contends that the Appeal Council's decision neither mentioned the SSR 83-20 factors (individual's allegation, work history, and medical evidence) nor articulated reasons for rejecting her allegation.

Plaintiff's contentions do not reflect accurately the Appeals Council's decision and are not supported by the record as a whole. In its decision, the Appeals Council specifically mentioned May 7, 2002, as Plaintiff's alleged disability onset date and the date on which she stopped working.[145] The Appeals Council properly gave primary significance to Plaintiff's medical record, noting that Plaintiff's impairment was severe, but not at a listing level of severity prior to June 7, 2004.[146]

This is not a case where medical evidence is lacking or ambiguous. Plaintiff returned for doctor visits and MRIs on a

---

[145]    Tr. 12.

[146]    Tr. 12-13.

regular basis.   The Appeals Council did not arbitrarily set an onset date; rather, it consulted a medical adviser, Dr. Santini, who provided an informed and reasoned judgment based on the medical record.   Dr. Santini found that Plaintiff met the requirements of Listing 13.13 at the point of the June 2004 MRI, which indicated growth of the tumor.   Listing 13.13(A)(2) requires medical evidence of "[a]ny central nervous system neoplasm[147] progressive or recurrent following initial antineoplastic therapy."  According to Dr. Santini, Plaintiff's surgical interventions amounted to "initial antineoplastic therapy" and the June 2004 MRI showed that the tumor was progressive.   Until that date, Plaintiff's condition had not reached listing level.

As explained by the Appeals Council, the medical record supports the conclusion that Plaintiff was capable of performing a reduced range of light exertional work prior to June 2004.[148]   In 2002, Plaintiff underwent several surgeries that, in some measure, alleviated her headaches, improved her vision, and decreased the size of the tumor.   In September 2002, Plaintiff was not experiencing seizures, changes in her level of consciousness, memory difficulties, or instability while walking.   Two months later, Dr. Conrad noted that Plaintiff had tolerated the two tumor resections well and was functioning well.   Other than mild short-

---

[147]    A neoplasm is "any abnormal growth of new tissue, benign or malignant."  Mosby's at 601.

[148]    Tr. 13.

term memory difficulties, Plaintiff expressed no complaints.  Dr. Conrad, at that time, expressed hope that Plaintiff would be able to return to work.

Although Dr. Conrad opined that Plaintiff was permanently disabled in March 2003, he released her to return to work in July 2003.  In July 2003, Dr. Conrad noted that Plaintiff was able to manage her memory problems and was "clinically and radiographically" stable.  The tumor had not grown as of January 12, 2004.  Plaintiff was experiencing mild-to-moderate headaches that were relieved by over-the-counter medication.  In May 2004, Plaintiff reported that the treatment for depression and anxiety was going well and that she was not experiencing seizures, headaches, nausea, focal motor or sensory changes, or alterations in mental status.

Throughout the period May 2002 through May 2004, Plaintiff was capable of preparing meals, preparing her son for school and for bed, cleaning house, washing clothes, walking, shopping, and dropping off and meeting her son at school.  Even though she experienced increased short-term memory loss, headaches, and decreased vision at various times, she remained able to read, watch television, use a telephone, garden, groom herself throughout the two years and had no exertional, manipulative, or communicative limitations at any point.  She was only restricted from climbing ladders, ropes, or scaffolds and from working around hazards.

29

Based on Mr. King's testimony at the ALJ hearings, such limitations would not preclude employment.

All of the above evidence supports a finding that Plaintiff was capable of limited light work prior to June 7, 2004. The court, therefore, finds that the Appeals Council's decision is supported by substantial evidence. The court also agrees with Defendant that the Appeals Council applied proper legal standards in evaluating the evidence and in making its determination.

### IV. Conclusion

Based on the foregoing, the court **GRANTS** Defendant's motion for summary judgment and **DENIES** Plaintiff's motion.

**SIGNED** in Houston, Texas, this 23rd day of March, 2007.

Nancy K. Johnson
United States Magistrate Judge

30